**[J-28-2017] [MO: Dougherty, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| MISSION FUNDING ALPHA, | : | No. 2 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 313 FR |
| | : | 2012 dated January 14, 2016, exited |
| v. | : | January 15, 2015, overruling the |
| | : | Commonwealth's exceptions and |
| | : | entering judgment of the December 10, |
| COMMONWEALTH OF PENNSYLVANIA, | : | 2015 order that reversed the decision of |
| | : | the Board of Finance and Revenue |
| Appellant | : | dated March 27, 2012 and exited on |
| | : | March 30, 2012 at No. 1118798 |
| | : | |
| | : | ARGUED: May 9, 2017 |

**CONCURRING OPINION**

**JUSTICE DONOHUE** **DECIDED: November 22, 2017**

Resolution of this appeal turns on the interpretation of the phrase "actual payment of tax" as used in section 3003.1 of the Tax Reform Code, 72 P.S. § 10003.1(a), governing petitions for refunds.[1] I agree with the Majority's conclusion that this phrase is properly interpreted as referring to the date that payment is transferred from the taxpayer's account to the Department of Revenue and accepted by it, and not, as the Commonwealth Court concluded, the date when the taxpayer files the annual tax report. *See* Majority Op. at 25. I also agree that in this case, the date of

---

[1] "For a tax collected by the Department of Revenue, a taxpayer who has actually paid tax, interest or penalty to the Commonwealth … may petition the Department of Revenue for refund or credit of the tax, interest or penalty. Except as otherwise provided by statute, a petition for refund must be made to the department within three years of actual payment of the tax, interest or penalty." 72 P.S. § 10003.1(a).

actual payment by Mission Funding Alpha ("MFA") was April 15, 2008, which was the due date for MFA's tax report. *See id.* I write separately to emphasize that this holding should not been interpreted as a blanket rule that the statutory due-date for the filing of a tax report is the date of actual payment for purposes of calculating the period during which a taxpayer may file a refund petition pursuant to section 3003.1(a).

None of the operative facts are in dispute. Throughout 2007, MFA made quarterly estimated tax payments toward its tax obligation. April 15, 2008 was the last date for MFA to file its tax report, yet MFA did not file a tax report on that date or seek an extension of time. More than five months later, on September 19, 2008, MFA filed its 2008 tax report. In this report, MFA determined that, through its estimated payments and a credit that was carried forward from a prior year, it overpaid its taxes in the amount of $81,778. On the tax report, MFA requested that the overpayment be transferred as a credit to future tax obligations. The Department of Revenue accepted the report but imposed a penalty of $913 for filing it late. On September 16, 2011, MFA filed a petition for refund.

The Tax Reform Code provides that "a petition for refund must be made … within three years of actual payment of the tax[.]" 72 P.S. §10003.1(a). It further provides that the taxpayer shall make quarterly estimated tax payments, and that any remaining taxes due "shall be paid upon the date [its] annual report is required to be filed without reference to any extension of time for filing such report." 72 P.S. § 10003.2(c)(2). For the 2007 tax year, MFA's annual tax report was required to be filed on April 15, 2008. 72 P.S. § 7403(a)(1)(i).

The question with which we are faced is when MFA's tax payments, all of which were made prior to April 15, 2008 were "actually paid." The Commonwealth Court defined "payment" as the performance of an obligation by delivery of money, which is then accepted in partial or full satisfaction the obligation. *Mission Finding Alpha v. Commonwealth*, 129 A.3d 614, 617-18 (Pa. Commw. 2015). It reasoned that until MFA determined its tax liability and filed its tax report, it did not have a tax obligation. *Id.* at 618-19. As such, the Commonwealth Court concluded, the estimated tax payments, although tendered to the Department of Revenue, could not be applied to an obligation until MFA filed its tax report. *Id.* at 619. Until that time, it decided, these sums were "the mere depositing of money on account for potential future use." *Id.*

Respectfully, this analysis is flawed. A straightforward reading of the relevant statutory provisions reveals that the Tax Reform Code unmistakably distinguishes between the payment of tax and the filing of a tax report, such that "payment" is in no way dependent on the filing of a tax report. For instance, section 7403, "Reports and payment of tax," devotes separate subsections to the filing of a report and the payment of tax. *Compare* 72 P.S. § 7403(a) (establishing obligation to file tax report and specifying date of filing and content thereof), *and* § 7403(b) (establishing obligation to pay estimated taxes). Within section 7403, the division is made particularly explicit in subsection (b), which provides that each corporation has a duty "to pay estimated tax under section [10003.2] and to make final payment of the tax due … with the annual report required by this section." 72 P.S. § 7403(b). That this provision requires taxes to be paid at times other than the filing of the tax report illuminates the distinct nature of

these transactions. In the same way, section 10003.2(c)(2) describes the payment of estimated taxes as separate from the filing of a tax report:

> Payment of estimated capital stock and franchise tax shall be made in equal installments on or before the fifteenth day of the third, sixth, ninth and twelfth months of the taxable year. The remaining portion of the capital stock and franchise tax due, if any, shall be paid upon the date the corporation's annual report is required to be filed without reference to any extension of time for filing such report.

72 P.S. § 10003.2(c)(2). This statute characterizes the sums tendered as quarterly estimated tax as payments, not deposits, and clearly anticipates that these payments occur separate from, and prior to, the filing of a tax report.

In further agreement with this premise is the fact that different penalties are imposed for the late payment of taxes owed (assessment of interest on the amount owed) and the late filing of a tax report (a fee based on amount of tax owed, explicitly not subject to interest). *See* 72 P.S. § 7403(c),(d). Indeed, in the present case, when the Department accepted and processed MFA's late tax report, it assessed a late filing penalty of $913, but did not assess a late payment penalty in the form of interest. Stipulations of Fact, 5/26/2105, ¶¶ 19-20. Interest penalties are imposed on "[a]ll taxes … from the date they become due and payable **until paid**." 72 P.S. § 806 (emphasis added); *see also* 72 P.S. § 7403(c). If the Commonwealth Court's conclusion was accurate and the taxes were not paid until the filing of the tax report, the Department would have assessed an interest penalty under section 806, as interest penalties are tied expressly to payment. To me, the fact that it did not impose an interest penalty is confirmation that pursuant to the Tax Reform Code, the Department of Revenue accepted and applied the estimated payments to MFA's tax obligation of as of April 15,

2008.[2] If the General Assembly had intended for the period for filing a refund petition to be tied to the filing of the tax report, it could have explicitly so stated.

In the present case, because MFA's estimated tax payments were accepted and applied on the same date its tax report was required to be filed, the operative date for the calculation of the limitations period coincides with the due-date for filing the tax report (April 15,2008). This result is driven entirely by these particular facts, and different facts would yield different results. If, for instance, MFA had not made any estimated payments and instead tendered payment with its delinquent tax report, on September 16, 2008, the limitations period for seeking a refund would have begun on that date, as it was the date of actual payment. This might seem to be an unfair result, as it extends the period for applying for a refund for a taxpayer who ignores its statutory obligation to make quarterly estimated payments, s*ee* 72 P.S. § 10003.2(a) (requiring the payment of estimated taxes), but it is not. If a taxpayer takes this course, it would be subject to an interest penalty on the entire amount of tax owed. 72 P.S. § 7403(c) (providing that interest is imposed from date tax is due until paid). Assuming arguendo that a taxpayer fails to make required quarterly payments and then also overpays taxes with a lump sum, the interest penalty would diminish the amount of any refund due. In this respect, the exposure to an interest penalty acts as a counterbalance to any benefit that might otherwise be gained by virtue of a later date for filing a refund petition.

---

[2] This rationale mirrors how the Fiscal Code mandates that the Department of Revenue handle amounts of overpayment that result from estimated tax payments. *See* 72 P.S. § 806.1(a)(2) (providing that any amount that is overpaid as an estimated tax "shall be deemed to have been overpaid on the last day prescribed for filing the final return or report for the taxable year[.]").

Yet another result would have occurred if MFA had made insufficient quarterly tax payments and remitted an additional payment with its late tax report. Pursuant to our holding, in such a situation the estimated payments would been have accepted for payment as of April 15, 2008. The amount paid with the tax report would be deemed actually paid on September 19, 2008, as that is the date of its tender to, and acceptance by, the Department of Revenue. Thus, only an amount not exceeding this belated payment would have been recoverable by a refund petition. However, this portion would have also been subject to a late-payment interest penalty, 72 P.S. § 7403(c), thus, reducing the amount of any refund.

In sum, the rule we announce here is fact-sensitive, and various results will arise from its application. While the Commonwealth Court's bright-line rule has the appeal of simplicity, it is unsupported by the statutory scheme.